**Debra A. and George SIMON, et al., Appellees,**

v.

**G.D. SEARLE & CO., Appellant.**

**No. 85–5334.**

United States Court of Appeals, Eighth Circuit.

Submitted March 13, 1986.

Decided April 13, 1987.

Rehearing and Rehearing En Banc Denied July 7, 1987.

Gregory L. Wilmes, Minneapolis, Minn., for appellant.

Roger Brosnahan, Minneapolis, Minn., for appellees.

Before JOHN R. GIBSON and WOLLMAN, Circuit Judges, and HARRIS,* Senior District Judge.

WOLLMAN, Circuit Judge.

G.D. Searle & Co. appeals the district court's order permitting discovery of certain Searle documents. Pursuant to 28 U.S.C. § 1292(b) (Supp. III 1985), the district court found that its order involved controlling questions of law as to which there was substantial ground for difference of opinion and certified two questions for appeal. The issues in this appeal, reflected in the district court's certified questions, are, first, whether corporate risk management documents prepared by non-lawyer corporate officials, but revealing aggregate information compiled from individual case reserve figures determined by lawyers, are protected from discovery by the work product doctrine or the attorney-client privilege, and, second, whether Rule 26(b)(2) of the Federal Rules of Civil Procedure limits discovery of corporate risk management documents that relate to insurance.

Searle manufactures an intrauterine contraceptive device known as the "Cu–7." Approximately forty products liability actions pending against Searle in the United States District Court for the District of Minnesota and seeking damages for injuries alleged to have resulted from use of the Cu–7 were consolidated for discovery and have generated this appeal. The dis-

---

* The HONORABLE OREN HARRIS, Senior United States District Judge for the Eastern and Western Districts of Arkansas, sitting by designation.

trict court appointed a special master to supervise the discovery process in these cases.

The district court[1] originally ordered Searle to produce "each and every document contained in its files which relates to the Cu–7 IUD." Although Searle produced approximately 500,000 documents to appellees and has continued to provide documents, it resisted the discovery of certain documents from its risk management department. Searle's risk management department monitors the company's products liability litigation and analyzes its litigation reserves, apparently utilizing individual case reserve figures determined by the legal department's assessment of litigation expenses. The risk management department also has responsibility for the company's insurance coverage. Insofar as Searle's products liability insurance has a high deductible amount, the company is in some respects self-insured.

Pursuant to a district court order, the documents at issue were provided to the special master for *in camera* review. The special master filed with the court his Reports I and II, containing his recommendations concerning the individual documents. He found that the risk management documents were protected by the work product doctrine to the extent that they revealed "specific litigation strategy or mental impressions of attorneys in evaluating cases, or setting a reserve for a specific case," and by the attorney-client privilege if they included communications between an attorney and client concerning legal advice made and kept in confidence. Report I of Special Master, *Simon v. G.D. Searle & Co.*, No. 4–80–160, at 5–7 (D.Minn. Aug. 22, 1984). Documents that revealed aggregate reserve information not identified with individual cases were found discoverable. *Id.* at 5–6. The district court adopted the special master's reports and granted Searle's request for certification pursuant to 28 U.S.C. § 1292(b) in an order issued June 7, 1985. The special master's Report III pro-

posed the questions for appeal, which the district court accepted and certified. The district court also stayed its June 7 order so far as it related to risk management and insurance documents, pending the outcome of this appeal. We granted Searle's petition for permission to appeal.

The questions certified for appeal are as follows:

1. To what extent, if any, should Searle's "Risk Management" documents, prepared by nonlawyer corporate officials in an attempt to keep track of, control and anticipate costs of product liability litigation for business planning purposes (including budgetary, profitability and insurance analysis), be protected from discovery by the Work Product Doctrine or the Minnesota attorney-client privilege because some portions of the documents reveal aggregate case reserves and aggregate litigation expenses for all pending cases when each individual case reserve is determined by Searle's lawyers on a confidential basis in anticipation of litigation?

2. To what extent, if any, does Fed.R. Civ.P. 26(b)(2) limited [sic] the discoverability of Searle's "Risk Management" documents that relate to insurance considerations?

I

STANDARD OF REVIEW

A preliminary question confronting us is the standard of review applicable to an appeal of discovery orders under 28 U.S.C. § 1292(b). That section allows appeals, at the discretion of the court of appeals, when the district judge believes that his action "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal * * * may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b) (Supp. III 1985). Appellees argue that we should not

---

1. The Honorable Miles W. Lord, United States District Judge for the District of Minnesota, retired September 11, 1985. All of the orders relevant to this appeal were issued prior to Judge Lord's retirement. The cases have since been assigned to the Honorable Robert G. Renner, United States District Judge for the District of Minnesota.

disturb the district court's discretion in discovery matters absent a "gross abuse of discretion resulting in fundamental unfairness." *Voegeli v. Lewis,* 568 F.2d 89, 96 (8th Cir.1977); *see also Prow v. Medtronic, Inc.,* 770 F.2d 117, 122 (8th Cir.1985). Searle contends that our role is not so restricted in an appeal under section 1292(b) and cites *Sperry Rand Corp. v. Larson,* 554 F.2d 868, 871 (8th Cir.1977). In *Sperry Rand* the court stated that the petitioner's choice of a mandamus action, for which the standpard of review is whether the district court exceeded the " 'sphere of its discretionary power,' " *id.* at 872 (quoting *Will v. United States,* 389 U.S. 90, 104, 88 S.Ct. 269, 278, 19 L.Ed.2d 305 (1967)), instead of a section 1292(b) appeal, seriously narrowed the scope of appellate review. We agree with Searle that our review in this section 1292(b) appeal is not confined to determining whether the district court abused its discretion. *See* 9 J. Moore, *Moore's Federal Practice* ¶ 110.-22[5] (2d ed. 1986) (review for abuse of discretion not suited to section 1292(b) because there is no controlling question of law). Section 1292(b) permits the appeal of orders otherwise unappealable and thus provides an avenue for resolving disputed and controlling questions of law, the resolution of which will materially further the litigation. Therefore, we review *de novo* the questions of law certified by the district court. Where, as here, the certified questions embody both factual and legal considerations, we should endeavor to give deference to the district court's factual determinations. We note, however, that the nature and scope of our review are not rigidly determined by the certified questions. *In re Oil Spill by the Amoco Cadiz,* 659 F.2d 789, 793 n. 5 (7th Cir.1981). We remain free to consider " ' "such questions as are basic to and underlie" ' " the questions certified by the district court. *Id.* (quoting *Helene Curtis Indus., Inc. v. Church & Dwight Co.,* 560 F.2d 1325, 1335 (7th Cir.1977) (quoting 9 J. Moore, *Moore's Federal Practice* ¶ 110.25[1], at 270)); *Merican, Inc. v. Caterpillar Tractor Co.,* 713 F.2d 958, 962 n. 7 (3d Cir.1983), *cert. denied,* 465 U.S. 1024, 104 S.Ct. 1278, 79

L.Ed.2d 682 (1984); *United States v. Connolly,* 716 F.2d 882, 885 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

## II

## WORK PRODUCT DOCTRINE

Searle's first argument is that its risk management documents are protected from discovery by the work product doctrine. That doctrine was established in *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), and is now expressed in Rule 26(b)(3) of the Federal Rules of Civil Procedure, which provides that "a party may obtain discovery of documents and tangible things * * * prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative * * * only upon a showing that the party seeking discovery has substantial need of the materials." Our application of the work product doctrine to specific documents is guided by the purposes of the doctrine set out in *Hickman. See In re Murphy,* 560 F.2d 326, 333–34 (8th Cir.1977). The work product doctrine was designed to prevent "unwarranted inquiries into the files and mental impressions of an attorney," *Hickman,* 329 U.S. at 510, 67 S.Ct. at 393, and recognizes that it is "essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Id.* at 510–11, 67 S.Ct. at 393.

The special master found that the risk management documents at issue were generated in an attempt to keep track of, control, and anticipate the costs of Searle's products liability litigation; the documents have been so identified in the district court's first certified question. Report I of Special Master, *supra,* at 2. Many of the documents include products liability litigation reserve information that is based on reserve estimates obtained from Searle's legal department. When Searle receives notice of a claim or suit, a Searle attorney sets a case reserve for the matter. Case reserves embody the attorney's estimate of

anticipated legal expenses, settlement value, length of time to resolve the litigation, geographic considerations, and other factors. Affidavit of Eugene W. Bader, *Simon v. G.D. Searle & Co.*, No. 4–80–160, at 2 (D.Minn.) (Bader oversees Searle's risk management program). The individual case reserves set by the legal department are then used by the risk management department for a variety of reserve analysis functions, which the special master found were motivated by business planning purposes including budget, profit, and insurance considerations.

 The work product doctrine will not protect these documents from discovery unless they were prepared in anticipation of litigation. Fed.R.Civ.P. 26(b)(3); *see In re Grand Jury Subpoena*, 784 F.2d 857, 862 (8th Cir.1986), *cert. dismissed sub nom. See v. United States*, — U.S. —, 107 S.Ct. 918, 93 L.Ed.2d 865 (1987). Our determination of whether the documents were prepared in anticipation of litigation is clearly a factual determination:

> [T]he test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. But the converse of this is that even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of litigation.

8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2024, at 198–99 (1970) (footnotes omitted); *see Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 604 (8th Cir.1977), *on rehearing*, 572 F.2d 606 (8th Cir.1978) (en banc); *The Work Product Doctrine*, 68 Cornell L.Rev. 760, 844–48 (1983). The advisory committee's notes to Rule 26(b)(3) affirm the validity of the

Wright and Miller test: "Materials assembled in the ordinary course of business * * * or for other nonlitigation purposes are not under the qualified immunity provided by this subdivision." Fed.R.Civ.P. 26(b)(3) advisory committee notes. Applying this test, we do not believe it can be said that the risk management documents were prepared for purposes of litigation. We are no better qualified to evaluate the facts of this case than the special master and the district court,[2] and we believe their conclusion that the risk management documents are in the nature of business planning documents is a reasonable factual conclusion. The risk management department was not involved in giving legal advice or in mapping litigation strategy in any individual case. The aggregate reserve information in the risk management documents serves numerous business planning functions, but we cannot see how it enhances the defense of any particular lawsuit. Searle vigorously argues that its business is health care, not litigation, but that is not the point. Searle's business involves litigation, just as it involves accounting, marketing, advertising, sales, and many other things. A business corporation may engage in business planning on many fronts, among them litigation.

 Although the risk management documents were not themselves prepared in anticipation of litigation, they may be protected from discovery to the extent that they disclose the individual case reserves calculated by Searle's attorneys. The individual case reserve figures reveal the mental impressions, thoughts, and conclusions of an attorney in evaluating a legal claim. By their very nature they are prepared in anticipation of litigation and, consequently, they are protected from discovery as opinion work product. *Hickman*, 329 U.S. at 512, 67 S.Ct. at 394; *In re Murphy*, 560 F.2d 326, 336 (8th Cir.1977). We do not

---

**2.** The special master, with the aid of affidavits, document summaries, and briefs from the parties, reviewed all of the documents at issue *in camera* and in his Reports I and II made recommendations as to each document and in some instances as to sections within the documents. The district court adopted the special master's recommendations after a hearing that included

oral argument by the parties and testimony by the special master. Our review has been informed by a record containing all of these materials, with the exception that only six sample documents have been submitted to us *in camera* out of the approximately 400 documents that were provided to the special master.

believe, however, that the aggregate reserve information reveals the individual case reserve figures to a degree that brings the aggregates within the protection of the work product doctrine. The individual figures lose their identity when combined to create the aggregate information. Furthermore, the aggregates are not even direct compilations of the individual figures; the aggregate information is the product of a formula that factors in variables such as inflation, further diluting the individual reserve figures. Certainly it would be impossible to trace back and uncover the reserve for any individual case, and it would be a dubious undertaking to attempt to derive meaningful averages from the aggregates, given the possibility of large variations in case estimates for everything from frivolous suits to those with the most serious injuries. The purpose of the work product doctrine—that of preventing discovery of a lawyer's mental impressions—is not violated by allowing discovery of documents that incorporate a lawyer's thoughts in, at best, such an indirect and diluted manner.[3] Accordingly, we hold that the work product doctrine does not block discovery of Searle's risk management documents or the aggregate case reserve information contained therein.

3. This conclusion is consistent with the holding of *In re Murphy,* 560 F.2d 326, 336 n. 20 (8th Cir.1977), that opinion work product is discoverable only in "rare and extraordinary circumstances." The individual case reserve figures are nondiscoverable opinion work product, but when gathered into the aggregates no identifiable opinion work product remains.

The same observation also applies to *Sporck v. Peil,* 759 F.2d 312 (3d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985), and to this court's recent decision in *Shelton v. American Motors Corp.,* 805 F.2d 1323 (8th Cir. 1986). *Sporck* involved discovery attempts relating to a group of documents that were used to prepare for a deposition. The court held that defense counsel's selection of certain documents, out of the thousands involved in the litigation, to prepare a deponent was protected by the work product doctrine, because allowing identification of the documents as a group would reveal counsel's mental impressions. *Shelton* involved a deposition of defendant's in-house counsel, who was questioned as to the existence of certain documents. The court held that the work product doctrine protected knowledge of the existence of the documents, because

## III

## ATTORNEY–CLIENT PRIVILEGE

 Searle also argues that its risk management documents are protected by the attorney-client privilege. Rule 501 of the Federal Rules of Evidence provides that evidentiary privileges are to be determined in accordance with state law in diversity actions. Consequently, the Minnesota attorney-client privilege, codified at Minn. Stat.Ann. § 595.02, subd. 1(b) (West Supp. 1987),[4] is applicable here.

The risk management documents reflect attorney-client communications running in two directions. First, the aggregate reserve information contained in the documents incorporates the individual case reserve figures communicated by the legal department to the risk management department—an attorney-to-client communication. Second, the record indicates that some of the risk management documents themselves were delivered to Searle attorneys—a client-to-attorney communication.

 Assuming *arguendo* that the attorney-client privilege attaches to the individual case reserve figures communicated

any recollection of a document's existence would mean that it was important enough to remember, and thus "necessarily would reveal [counsel's] mental selective process." *Shelton,* 805 F.2d at 1329. As we have said, the nature of the aggregate reserve figures at issue here is such that revealing them will not necessarily reveal the specific case reserves and the protected mental impressions embodied therein. In both *Sporck* and *Shelton,* counsel's mental impressions, namely the impressions that certain documents were important or significant, would have been exposed to the world. Clairvoyants aside, no one will learn from the aggregate reserve figures what Searle's attorneys were thinking when they set individual case reserves.

4. Minn.Stat.Ann. § 595.02, subd. 1(b) (West Supp. 1987) provides:

An attorney cannot, without the consent of the attorney's client, be examined as to any communication made by the client to the attorney or the attorney's advice given thereon in the course of professional duty; nor can any employee of the attorney be examined as to the communication or advice, without the client's consent.

by the legal department to the risk management department,[5] we do not believe the privilege in turn attaches to the risk management documents simply because they include aggregate information based on the individual case reserve figures. For the reasons that we have already stated in relation to the work product doctrine, we do not believe that the aggregate information discloses the privileged communications, which we are assuming the individual reserve figures represent, to a degree that makes the aggregate information privileged.[6] The attorney-to-client communications reflected in the risk management documents are therefore not protected by the attorney-client privilege.

Although the aggregate reserve information does not confer attorney-client privilege protection to the risk management documents, those documents that were given to Searle attorneys may still be privileged client-to-attorney communications. The special master devoted only a very brief discussion to this matter. Relying on *Brown v. St. Paul City Ry.*, 62 N.W.2d 688 (Minn.1954), the special master stated: "A business document is not made privileged by providing a copy to counsel. * * * Thus, those documents from one corporate officer to another with a copy sent to an attorney do not qualify as attorney client communications." Report I of Special Master, *supra*, at 7 (citation omitted). We perceive no error in this statement of the law, which appears to have been carefully applied by the special master to the point of redacting sections of privileged material from within individual documents.

Minnesota adheres to Professor Wigmore's classic statement of the attorney-client privilege, which requires that an attorney-client communication relate to the purpose of obtaining legal advice before it is protected.[7] *Brown v. St. Paul City Ry.*, 241 Minn. 15, 62 N.W.2d 688, 700 (1954) (quoting 8 Wigmore, *Evidence* § 2292 (3d ed.)); *see National Texture Corp. v. Hymes*, 282 N.W.2d 890, 895–96 (Minn. 1979). Moreover, a number of courts have determined that the attorney-client privilege does not protect client communications that relate only business or technical data. *See First Wis. Mortgage Trust v. First Wis. Corp.*, 86 F.R.D. 160, 174 (E.D.Wis. 1980); *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 515 (D.Conn.) ("[l]egal departments are not citadels in which public, business or technical information may be placed to defeat discovery and thereby ensure confidentiality"), *appeal dismissed*, 534 F.2d 1031 (2d Cir.1976). Just as the minutes of business meetings attended by attorneys are not automatically privileged, *see International Tel. & Tel. Corp. v. United Tel. Co.*, 60 F.R.D. 177, 185 (M.D.Fla. 1973); *Air-Shield, Inc. v. Air Reduction Co.*, 46 F.R.D. 96, 97 (N.D.Ill.1968), business documents sent to corporate officers and employees, as well as the corporation's attorneys, do not become privileged automatically. Searle argues, however, that

---

5. We state no view whether the attorney-client privilege in fact attaches to the individual case reserve figures, other than to note that such a determination would require analysis of whether the individual reserve figures are based on confidential information provided by Searle. *United States v. Amerada Hess Corp.*, 619 F.2d 980, 986 (3d Cir.1980); *Mead Data Central, Inc. v. United States Dep't of the Air Force*, 566 F.2d 242, 254 (D.C.Cir.1977); *see also Hickman v. Taylor*, 329 U.S. 495, 508, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947); *Schwimmer v. United States*, 232 F.2d 855, 863 (8th Cir.), *cert. denied*, 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956). We need not decide whether the individual case reserve figures are protected in the light of our determination that even if they are it does not follow that the aggregate information in the risk management documents also is protected.

6. When a client acts on privileged information from his attorney, the results are protected from discovery to the extent that they disclose the privileged matter, directly or inferentially. *Cf. Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 611 (8th Cir.1977). Our holding is faithful to this principle. As we have discussed, the individual case reserve figures cannot be traced or inferred from the aggregate information.

7. 8 Wigmore, *Evidence* § 2292 (McNaughton rev. 1961) (emphasis omitted) states:
(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

the special master formulated a *per se* rule barring privilege claims where a document is sent to corporate officials in addition to attorneys. We do not read the special master's report as establishing such an approach. Client communications intended to keep the attorney apprised of business matters may be privileged if they embody "an implied request for legal advice based thereon." *Jack Winter, Inc. v. Koratron Co.*, 54 F.R.D. 44, 46 (N.D.Cal.1971). Based on this view of the special master's report, we do not understand the district court to have taken an errant position on the law of the attorney-client privilege. Having stated the applicable law, and noting that there are only six sample documents before us, we decline any invitation to determine the applicability of the privilege to individual documents.

## IV

### SCOPE OF RULE 26(b)(2)

██ The district court's second certified question concerns whether Fed.R.Civ.P. 26(b)(2) limits discovery of the corporate risk management documents. Rule 26(b)(2) provides:

> A party may obtain discovery of the existence and contents of any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

Searle argues that Rule 26(b)(2) contains an implicit limitation on the discovery of insurance information beyond the insurance agreement itself. Searle has produced its insurance policies. It now argues that all other insurance information, which it defines to include its reserve information, is nondiscoverable. Appellees respond that Rule 26(b)(2) was not intended to limit discovery but to end the conflict over the relevancy of insurance policies for discovery purposes. Thus we are presented with the question whether the reserve information of a self-insured defendant is discoverable.

The advisory committee's notes to Rule 26(b)(2) reveal that the rule, which was included in the 1970 amendments to the Federal Rules, was not intended to change existing law on discovery concerning self-insured businesses that maintain a reserve fund. Fed.R.Civ.P. 26(b)(2) advisory committee notes; *see Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 & n. 16, 98 S.Ct. 2380, 2390 & n. 16, 57 L.Ed.2d 253 (1978). Therefore, the controlling law on this question is that which would have applied to insurance agreements before the 1970 amendments, together with any recent developments concerning insurance documents other than agreements. Prior to the 1970 amendments, "the discovery of matters pertaining to insurance depend[ed] on whether such information was 'relevant to the subject matter' or 'reasonably calculated to lead to admissible evidence.' " 4 J. Moore, *Moore's Federal Practice* ¶ 26.62[1] (2d ed. 1986). This standard, which comes from Fed.R.Civ.P. 26(b)(1), remains applicable to insurance documents other than agreements. We cannot agree with Searle that Rule 26(b)(2) forecloses discovery of any insurance document beyond the agreement. First, the language of the rule itself plainly is not preclusive. Second, the advisory committee expressed concern, at least as to indemnity agreements, that Rule 26(b)(2) not be interpreted to protect insurance information from discovery when that information is relevant under Rule 26(b)(1). *See id.* ¶ 26.62[2]. We hold, therefore, that insurance documents that are not discoverable under Rule 26(b)(2) remain discoverable in accordance with the provisions of Rule 26(b)(1).[8] *Id.*

## V

### CONCLUSION

Although we have no disagreements with the law as stated by the special master, we

---

8. The district court reached the same conclusion, and decided that the risk management documents were discoverable under Rule 26(b)(1) because they relate to issues of notice, defect, and punitive damages. We find no reason to disturb this application of the relevant legal standard. Moreover, we also agree with the district court that even if Rule 26(b)(2) were to prevent discovery of insurance documents, we are doubtful that the risk management documents correctly can be termed insurance documents.

recognize that our analysis may have resolved sub-issues not anticipated by the district court. We therefore instruct the district court to review its determinations with respect to the individual documents in the light of the views set forth in this opinion.[9] Moreover, our review of the sample documents leaves us with the definite impression that if they are truly representative of those that will ultimately be held to be discoverable, appellees will acquire nothing in the way of admissible evidence on the issue of liability or on the issue of damages, either compensatory or punitive. The sample documents reveal nothing more than the prudent business decisions that any corporation must necessarily make if it hopes to survive in this litigious age.

With the foregoing qualifications, the order of the district court is affirmed.

JOHN R. GIBSON, Circuit Judge, dissenting.

The court today correctly concludes that individual case reserves set by Searle's attorneys are protected as mental impressions, thoughts, and conclusions under the opinion work product doctrine. It then concludes that averages and aggregates derived from these reserves are not protected. There is a deep inconsistency in protecting the parts but determining that the sum of the parts and calculations based upon the protected figures are not protected.

The court properly reasons that because the Searle attorneys' specific case reserve figures "embody the attorney's [sic] estimate of anticipated legal expenses, settlement value, length of time to resolve the litigation, geographic considerations, and other factors," they reveal the attorneys' mental impressions concerning Searle's pending litigation and are therefore protected opinion work product. *Ante* at 401. The court then denies protection to the risk management documents, which were derived from the nondiscoverable mental impressions of Searle's attorneys and, as the

special master found, "arguably [give the] plaintiffs some insight into Searle's attorneys' thought processes of setting reserves." Report I of Special Master, *Simon v. G.D. Searle & Co.*, No. 4–80–160, at 5–6 (D.Minn. Aug. 22, 1984). In allowing discovery of the risk management documents, the court fails to consider the full import of the mental impression/opinion work product doctrine, which gives virtually absolute protection to both the mental impressions of Searle's attorneys—as contained in the specific case reserve figures and necessarily reflected in the risk management documents—and the mental impressions of Searle's representatives, as contained in the risk management reports.

Since the Supreme Court's decision in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the courts have recognized that particular solicitude is given mental impression/opinion work product as contrasted to the ordinary work product protection accorded other documents and materials prepared in anticipation of litigation. In *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), the Supreme Court recognized mental impression/opinion work product as "deserving special protection" under Rule 26. *Id.* at 400, 101 S.Ct. at 688. The Court considered, but found unnecessary to decide, whether any showing of necessity could ever overcome the protection afforded such work product. It recognized, however, that simply showing "substantial need and inability to obtain the equivalent without undue hardship" is not sufficient. *Id.* at 401, 101 S.Ct. at 688. In *Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir.1986), we observed that the work product doctrine protects not only materials obtained or prepared in anticipation of litigation, "but also the attorney's mental impressions, including thought processes, opinions, conclusions, and legal theories." *Id.* at 1328; *see also Sporck v. Peil*, 759 F.2d 312, 316 (3d Cir.) ("Rule 26(b)(3) recognizes the distinction between 'ordinary' and 'opinion' work product first articulated by

---

**9.** We are concerned about the reference to loss reserves for a specific case mentioned in the sample *in camera* documents submitted to us. Those references presumably should be redacted.

the Supreme Court in *Hickman v. Taylor* "), *cert. denied,* —— U.S. ——, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985); *In re Murphy,* 560 F.2d 326, 336 (8th Cir.1977) ("opinion work product enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances"). The court today fails to give full weight to the special protection accorded mental impression/opinion work product.

In the present case, we are asked to protect mental processes that go to the essence of the lawyer's expertise—establishing the value of a legal claim and the fees and expenses that may be incurred in its defense. The litigation's ultimate cost to the client has great significance in determining whether a lawsuit will be tried or settled and, if settled, for what amount. Establishing the value of a claim is analytically complex, requiring an assessment of the body of evidence and the particular legal issues involved in each case, as well as an evaluation of the case's strengths and weaknesses. It is one of the more challenging and difficult tasks a lawyer confronts. In *Work Product of the Rulesmakers,* 53 Minn.L.Rev. 1269 (1969), Professor Edward H. Cooper discusses the importance of an attorney's private evaluation of a claim in facilitating the bargaining process inherent in our system of justice:

> Some of the areas in which the work product doctrine forecloses discovery are easily comprehended * * * as well. One obvious example is the need for protection against forced revelation of a party's evaluation of his case; as long as voluntary settlement is encouraged, it would be an intolerable intrusion on the bargaining process to allow one party to take advantage of the other's assessment of his prospects for victory and an acceptable settlement figure.

*Id.* at 1283.

The special master's report states that the aggregate reserve figures may give some insight into the mental processes of the lawyers in setting specific case reserves. This is inevitable, considering that these aggregates and averages are based upon the attorneys' evaluations of the value of specific claims. Notably, this is not a situation where mental impressions are merely contained within and comprise a part of another document and can easily be redacted. Instead, the aggregate and average figures are derived from and necessarily embody the protected material. They could not be formulated without the attorneys' initial evaluations of specific legal claims. Thus, it is impossible to protect the mental impressions underlying the specific case reserves without also protecting the aggregate figures.

Apparently, the court reasons that if an attorney's mental impressions are revealed only indirectly and in a diluted manner, they are not protected as opinion work product. *See ante* at 401–02 & n. 3. This, however, has never been used as a criteria for applying the opinion work product doctrine. In *Shelton v. American Motors Corp., supra,* we held that an attorney could not be compelled to acknowledge whether specific corporate documents existed because such acknowledgments would reveal her mental processes, which are protected under the opinion work product doctrine. *Id.* at 1329. The selection of documents involves a substantially less complex mental process than does arriving at a case reserve figure. In selecting documents, an attorney assesses a document's relevance and materiality to the legal issues in the case, and considers its admissibility. This analysis stops short of the weighing and evaluating necessary to determine case reserves. Yet, in *Shelton* we protected this information, for the opinion work product doctrine does not merely protect materials that, as the majority suggests, directly reveal an attorney's undiluted mental impressions. Instead, the doctrine is premised on values fundamental to the American scheme of justice and protects information that even "tends to reveal the attorney's mental processes." *Upjohn Co.,* 449 U.S. at 399, 101 S.Ct. at 687. The risk management documents certainly fall within this protected ambit. The relationship between the attorneys' mental impressions and these documents is no less tenuous than the relationship between the attorney's mental impressions and the in-

formation we held nondiscoverable in *Shelton. See also Sporck*, 759 F.2d at 315–17 (selection of documents is in the "highly protected category of opinion work product").

The court is equally in error in focusing solely on the mental impressions of Searle's lawyers. While the court protects the mental impression/opinion work product concerning the attorneys' evaluation of the reserve necessary for each lawsuit, it fails to grant similar protection to the risk management department's opinion work product concerning the aggregate reserve necessary for the Cu–7 litigation. I find no basis in Rule 26(b)(3) for this distinction. Rule 26(b)(3) requires a court to "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney *or other representative* of a party concerning the litigation." Fed. R.Civ.P. 26(b)(3) (emphasis added). Thus, protected work product is not confined to information or materials gathered or assembled by a lawyer. *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 603, *rev'd in part on other grounds*, 572 F.2d 606 (8th Cir.1977). Instead, it includes materials gathered by any consultant, surety, indemnitor, insurer, agent or even the party itself. Fed.R.Civ.P. 26(b)(3). The only question is whether the mental impressions were documented, by either a lawyer or nonlawyer, in anticipation of litigation. Here, in the face of pending litigation, the risk management group monitored, controlled, and anticipated the costs of the litigation. The group compiled the individual reserve figures established by Searle's attorneys and analyzed them in light of a number of variables to arrive at aggregate reserve figures. This is no less a mental impression concerning Searle's litigation than were the attorneys' thoughts in arriving at individual reserve figures.

The court concludes that the risk management documents cannot qualify for work product protection because they were not prepared in anticipation of litigation. It reasons that "Searle's business involves litigation," and, therefore, the risk management documents are for business planning purposes. *Ante* at 401. The court thus concludes that the risk management documents fall into the "ordinary course of business" exception to the work product doctrine. *See* Fed.R.Civ.P. 26(b)(3) advisory committee note. This analysis, however, causes the exception to swallow the rule and makes the anticipation-of-litigation test meaningless as it concerns materials prepared by a defendant's employees.

First, we cannot authorize discovery of documents containing representatives' mental impressions concerning pending litigation simply because the documents also serve a business purpose. It is difficult to imagine a document that is generated by a party's nonlawyer representatives in anticipation of litigation that does not also have some business purpose; the purposes are not mutually exclusive. Under the court's analysis, almost every document prepared by a nonlawyer is subject to discovery despite Rule 26(b)(3)'s concern with protecting opinion work product of both the lawyer and nonlawyer. *See id.* ("Subdivision (b)(3) reflects the trend of the cases by requiring a special showing, not merely as to materials prepared by an attorney, but also as to materials prepared in anticipation of litigation or preparation for trial by or for a party or any representative acting on his behalf.") If all such records were discoverable, a business would be seriously impaired in calculating and recording the financial aspects of litigation or in taking other necessary corporate action regarding the litigation. Of course, just as not every document an attorney prepares concerning pending litigation is protected opinion work product, neither is every business document prepared by a nonlawyer. The determination, however, should not hinge on whether the material has an ancillary business purpose.

Second, in the present case, the business purposes of the documents were to keep track of, control, and plan for the costs of Searle's pending products liability litigation. Only by concluding that Searle is in the business of litigation can the court convert these litigation-oriented documents into business planning documents. The court reaches just this conclusion, however,

when it reasons that "Searle's business involves litigation, just as it involves accounting, marketing, advertising, sales, and many other things." *Ante* at 401. In eroding the protection Rule 26(b)(3) affords, the court confronts Searle with a dilemma of Catch–22 proportions: if Searle were not involved in litigation, Rule 26(b)(3) would have no application, but because Searle is involved in litigation, the ordinary course of business business exception applies. Thus, litigation, the event that triggers application of the rule, also triggers application of the exception.

Moreover, when considered within the increasingly common context of mass products liability litigation, the aggregate and average figures may take on even greater significance. Today's products liability litigation often involves hundreds of lawsuits against one or more corporate defendants based upon a single or related products. The plaintiffs in these cases usually join forces and are represented by organized counsel. The defense, if not unified, is usually coordinated. Settlements can be negotiated so as to dispose of the claims of all or several plaintiffs at once. *See, e.g.,* 3A L. Frumer & M. Friedman, *Products Liability* § 46A.07[1] (1986); Rubin, *Mass Torts and Litigation Disasters*, 20 Ga.L. Rev. 429, 431 (1986) (Agent Orange class estimated to include between 600,000 and 2.4 million plaintiffs; 4,500 plaintiffs' lawyers settled claims for $180,000,000); Vairo, *Multi-Tort Cases: Cause for More Darkness on the Subject, or a New Role for Federal Common Law*, 54 Fordham L.Rev. 167, 170 n. 6 (1985) (settlement fund established to dispose of 680 asbestos claims). Just as a specific reserve figure gives an opponent an unfair advantage in settlement negotiations, an aggregate reserve figure would give attorneys representing a group of opponents an equally unfair advantage. In this instance, the cases of forty plaintiffs with claims based on the Cu–7 have been consolidated for discovery in the Minnesota district court. Material that may be of questionable value in one case becomes more meaningful when considered in the context of a number of cases. We would be naive not to recognize the sophisticated analysis that is possible in this day of the computer. Comparison between different groups of cases and periods of time conceivably could give one party substantial insight into the thought processes of the other. Therefore, when the aggregate and average figures are produced for attorneys representing a large group of opposing litigants and are examined with reference to the entire group, the opposition obtains information containing the Searle attorneys' mental processes that is much less diluted and indirect than the court acknowledges. When we deal with so sensitive a mental process as the calculation of individual case reserves, the foundation for all of the aggregates and averages, Rule 26(b)(3), *Upjohn, Shelton,* and *Murphy* mandate that we accord this material special protection. We fail to do so when we make the aggregate and average figures available to the opponent.

Significantly, Searle is defending not one but rather hundreds of Cu–7 lawsuits. *See* Thornton, *Intrauterine Devices*, Trial, Nov. 1986, at 44, 46 (Searle defending more than 600 Cu–7 lawsuits). Searle is undoubtedly concerned with each lawsuit, and the court properly recognizes that the Searle attorneys' mental impressions concerning each lawsuit are protected. Searle's greater concern, however, is its liability exposure and the costs related to defending this aggregate of lawsuits. When subjected to mass tort litigation, a defendant should be allowed to confidentially analyze the litigation as a whole, plan for its defense, and compare the costs of settlement with the costs of proceeding through trial. The aggregate and average reserves play an essential and unique role in these activities. By requiring Searle to share its assessments with its adversaries, the court unfairly hinders Searle's ability to organize its defense.

A party, in managing its litigation, should not be forced to provide materials to its opponent that necessarily reflect its lawyers' mental impressions regarding the litigation and contain its agents' mental impressions concerning the cost of the litigation. By concluding that the risk manage-

ment documents are discoverable because they only indirectly reflect the attorneys' impressions and because they were created for business planning purposes, the court makes it extremely hazardous for a business to finance and plan for its defense. The incidental effect of this decision could be the failure of litigants to properly document and consider all the factors that bear upon the decision to try or settle lawsuits. *Cf. Hickman v. Taylor*, 329 U.S. at 511, 101 S.Ct. at 393 ("Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten.").

This is not a case where there has been limited discovery. Searle has produced over 500,000 documents. Those documents based on the mental impressions of its lawyers and representatives concerning litigation strategy and costs, which the court today admits may be of limited value, should not be the subject of discovery.